IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

KEN YEO,                                                                    Civ. No. 08-1317-AC

                              Plaintiff,                                    OPINION AND
                                                                                  ORDER

             v.

WASHINGTON COUNTY,
MULTNOMAH COUNTY, Jane Doe 1-10
and John Doe 1-10, PRISON HEALTH
SERVICES, INC.,

                              Defendants.

_____

ACOSTA, Magistrate Judge:

*Introduction*

         In late May 2007, Plaintiff Ken Yeo ("Yeo") turned himself in to authorities in Washington

County to satisfy an outstanding arrest warrant.  After several days in custody, which included

transfer to a different detention facility, Yeo was admitted into the hospital. Yeo has alleged claims against Defendants Washington County, Prison Health Services, Inc., and Multnomah County for violation of his substantive due process rights under 42 U.S.C. § 1983 and a negligence claim under the Oregon Tort Claims Act for injuries sustained during the period of his incarceration. Washington County and Prison Health Services together move for summary judgment on all claims; Multnomah County separately moves for summary judgment on all claims.

For the reasons stated below, Washington County and Prison Health Services motion is granted; Multnomah County's motion for summary judgment is denied; and Multnomah County's evidentiary objections, as asserted in its reply memorandum, are granted in part and denied in part.

*Factual Background*

I.    Arrest in Washington County

On May 27, 2007, at approximately 6:00 p.m., "Yeo turned himself in to the Washington County Jail because he believed there was an outstanding warrant for his arrest." (Washington County CSMF ¶ 3.) Yeo was taken into custody. Yeo recalls that he was taking his medications up until the time he turned himself in to Washington County.[1] (Yeo Depo. 25:12-16.) Upon intake, Yeo informed prison officials that he was on medication. (Yeo Depo. 25:21-25.)

A "Lodging Assessment" taken at 6:12 p.m. on May 27, 2007, indicates that Yeo was confused, disoriented, guarded, had grand ideas, and had previously been subject to mental health treatment. (Greenberg WC Decl., Ex. 1 at 2.) The form also indicated "yes" under "discipline" and "hazard." *Id.* Progress notes taken in 2005 appear on the same form and directly above progress

---

[1] There is some ambiguity on this point as the record also indicates that Yeo had been off his medications for two days prior to his arrival at Washington County Jail.

notes taken in 2007.  In particular, they state "[inmate] back in custody."  (Greenberg WC Decl., Ex. 1 at 6.)

At approximately eight that evening, "an Intake Medical Screening form was filled out by PHS staff."  (Washington County CSMF ¶ 4.)  Yeo's screening form indicates that he did not exhibit signs of abnormal behavior.  Yeo did report that he had mental health issues, was on medication, and stated the dosages he took of the drugs Thorazine, Klonopin, and Cogentin.  Yeo reported having been suicidal four or five years prior.  (Stone Decl., Ex. A at 12.)  To facilitate verification of his medications, "Yeo provided information to verify his need for medication and signed an authorization for his medication provider to release information about his medications to the Washington County Jail and [PHS]."  (Washington County CSMF ¶ 4.)  An undated or time stamped medical narrative indicates that Yeo last took his medications two days prior and signed a release of his medical information.  (Stone Decl., Ex. A at 13.)  Deputy Steve Nelson ("Nelson") testified that when Yeo arrived at Washington County in 2007, he was informed by other deputies that Yeo "was considered a potential threat, a dangerous inmate."  (Greenberg WC Decl., Ex. 3 at 20.)  What Nelson characterized as "prior knowledge" of Yeo included the fact that he had a tendency to spit on staff members and an awareness that Yeo had mental health issues.  *Id.*

## II.    Transfer to Multnomah County

Yeo was transferred from Washington County to Multnomah County on the morning of May 29, 2007, at which time his medications still had not been verified.  (Washington County CSMF ¶ 8.)  An incident report generated in Washington County states that prior to being transported to Multnomah County, Yeo was physically uncooperative and was placed in a restraint chair and spit sock.  (Greenberg WC Decl., Ex. 1 at 5.)  At the time of transport, Yeo was not compliant and, when

threatened with a taser, challenged the officer to tase him. After some struggle, during which Yeo

was kneed in the abdomen by a staff member, Yeo was placed in a restraint chair and spit sock, and

handcuffed. Yeo was monitored for approximately one hour while waiting for Multnomah County

officials to arrive. (Greenberg WC Decl., Ex. 1 at 5.) Yeo's prisoner transport form states that Yeo

reported taking Thorazine, Klonopin, and Cogentin, but that PHS did not currently possess Yeo's

medications. (Greenberg WC Decl., Ex. 2 at 1.) The form indicates that Yeo was suffering from

"schizo tendencies, bipolar" at the time of transport and that this condition might impact his

transport. *Id.* On his transfer papers, Yeo was classified as "assaultive." (Henry Decl., Ex. 1 at 19-

10.) This form also included the code "12-34," which indicates that the inmate has mental health

issues. (Greenberg Decl., Ex. 3 at 9.)

III.    Detention in Multnomah County

        Upon arrival at Multnomah County Detention Center ("MCDC"), Yeo refused to be

interviewed. Jesse Luna ("Luna"), a deputy with Multnomah County Sheriff's Office, testified that

at the time of booking Yeo was angry and difficult, but not incoherent. (Henry Decl., Ex. 16.)

Sheriff's Deputy John Tillinghast was performing "Classification Interviews" at the time of Yeo's

arrival at MCDC. (Tillinghast Decl. ¶4.) He wrote:

> Came in with severe warnings from Washington County, in full restraints and a spit
> sock. Apparently he had been in a restraint chair prior to transport and the
> Washington county deputies had to move the entire chair to the vehicle. He was
> greeted here with multiple deputies, and initially he was verbally abusive and
> physically resistant. [] When taser and pepper spray were made visible and ready, he
> became compliant enough to make it through the booking process. Once left alone
> in his sep[aration] cell, he promptly removed his clothes and stood on the toilet doing
> strange calisthenics-like movements.

(Henry Decl., Ex. 8 at 1.) Luna testified that Yeo arrived in a spit sock and with additional restraints

and was surrounded by five to seven deputies, and the reception area was cleared for Yeo.  (Luna Depo.  31:2-6; 31:23-32:6; 32:22-33:3; 34:21-24.)  Yeo reported that he was  "coming down from meth."  (Henry Decl., Ex. 6 at 2.)  Yeo was deemed potentially dangerous to others and required separate housing until he stabilized.  *Id*.  Yeo's Entry Progress Form ("EPF") is blank except for his name and identification number.  (Henry Decl., Ex. 1 at 1.)

That evening Anthony Watson ("Watson"), who was performing medication rounds, observed Yeo throwing water and toilet paper on his cell floor and being generally non-compliant.  Watson consulted with Sergeant Robinson and they enlisted the help of Deputy Maxwell, who was wielding a taser, at which time Yeo was cooperative and they were able to move him to another cell "without further incident."  (Greenberg Decl., Ex. 4 at 6.)

The following day, May 30, 2007, the day shift nurse attempted to complete the EPF but was unsuccessful, for unspecified reasons.  (Kitzing Decl. ¶¶ 5-6.)  Later that evening, at approximately 9:00 p.m., an attempt was made by Sokunthy Eath, a staff nurse with Multnomah County Corrections Health Program, to complete the EPF, but Yeo had smeared his cell with urine and feces and refused to talk to Eath, and instead stared at the ceiling and mumbled.  Eath testified that she did not consider it a mental health crisis, at that point, because Yeo was not in any physical danger.  (Greenberg Decl., Ex. 3 at 48.)

Approximately two hours later, MCDC staff attempted to remove Yeo from his cell so that it could be cleaned.  Yeo was covered with "fecal matter, urine, [and] food," and was naked.  (Henry Decl., Ex. 1 at 3.)  According to Deputy Harrington, who was present for the tasering, the officers attempted to remove Yeo from his cell so it could be cleaned, but Yeo was not compliant and refused to be put in handcuffs.  After a variety of attempts to gain his compliance, the officers warned Yeo

that if he did not cooperate, he would be tasered.  He refused to comply and, after another verbal

warning, the taser was deployed.  Yeo again refused to comply and a second round of tasering was

administered.  The officers were, at that time, able to cuff him and take him out into the hallway.

Once in the hallway, however, Yeo began wriggling around and was difficult to hold on to.  After

ignoring another verbal warning to stop moving, Yeo was tasered a third time, after which he became

"very compliant[.]"  (Greenberg Decl., Ex. 2 at 10.)  As a result of the tasering, Yeo sustained an

abrasion on his head with "minimal bleeding."  (Henry Decl., Ex. 1 at 3.)  His wound was tended

to by Eath and was no longer bleeding by the time he returned to his cell.  (Greenberg Decl., Ex. 2

at 11.)

     On the morning of May 31, 2007, Judy Ford ("Ford"), a psychiatric nurse with Multnomah

County, evaluated Yeo.  (Henry Decl., Ex. 1 at 8.)  Ford testified that she had no knowledge of Yeo

and his condition until May 31, 2007.  (Henry Decl., Ex.15 at 2.)  When she arrived, Yeo was

standing naked on his bunk and had again smeared feces and urine around his cell.  (Henry Decl.,

Ex. 1 at 8.)  He was "mumbling, difficult to understand, confused."  *Id.*  At this time, Ford consulted

with Dr. Errson and obtained medication for Yeo, which Yeo voluntarily took.  (Henry Decl., Ex.

15 at 2-3.)  He was given a "suicide watch smock" and became agitated when Ford attempted to

clean dried blood from his face.  Around 1:00 p.m., Ford noted that Yeo was quiet and cooperative.

(Henry Decl., Ex. 1 at 6.)  Later that evening, staff nurse P. Gayman ("Gayman") spoke with Yeo's

mother, Marple Alton ("Alton"), who expressed her concerns about her son and informed Gayman

that Yeo was on "heavy duty medications" which were managed at "Banyon Tree."  (Henry Decl.,

Ex. 1 at 9-10.)  Alton requested that Yeo be asked to sign a release of information form ("ROI").

*Id.*  At approximately 10:00 p.m., Yeo was presented with an ROI which he then signed.  (Henry

Decl., Ex. 1 at 10.)

The following day, June 1, 2007, Yeo was evaluated for hospitalization and subsequently hospitalized at Oregon Health Sciences University.

*Legal Standard*

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c) (2008). Summary judgment is not proper if material factual issues exist for trial. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id*. at 324. A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements. *Hernandez v. Spacelabs Medical, Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Thus, summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The court must view the evidence in the light most favorable to the nonmoving party. *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976). Where different ultimate inferences may be drawn,

summary judgment is inappropriate. *Sankovich v. Life Ins. Co. of North America*, 638 F.2d 136, 140 (9th Cir. 1981).

However, deference to the nonmoving party has limits. The nonmoving party must set forth "specific facts showing a *genuine* issue for trial." FED. R. CIV. P. 56(e) (2008) (emphasis added). The "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Therefore, where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted).

*Discussion*

I.    Washington County and PHS's Motion for Summary Judgment

Washington County and PHS move for summary judgment as to Yeo's claims on four grounds: (1) they cannot be held liable under section 1983 for the actions of their agents under a respondeat superior theory; (2) Yeo has produced no evidence of an official policy that deprived him of a constitutional right; (3) Yeo has produced no evidence of the requisite intent to entitle him to punitive damages; and (4) Yeo's negligence claims are impermissible in light of the physical injury rule and discretionary immunity.

With regard to Yeo's section 1983 claims, Yeo abandons his section 1983 claim against Washington County. Accordingly, summary judgment as to Washington County is granted on this claim. The court addresses the remaining claims, below.

A.    *Respondeat Superior Liability*

Yeo agrees that PHS would not be liable under section 1983 in that he does not allege

OPINION & ORDER                               8                                    {KPR}

liability under a respondeat superior theory, but rather alleges a direct claim against PHS for maintaining policies and practices that prevent inmates with serious mental illness from getting the care that they need.  Specifically, Yeo asserts that the following policies and practices of PHS are grounds for section 1983 liability:  delaying mental health treatment until medication verification has occurred, even if verification is not currently available; substituting medication verification for timely psychiatric evaluation; failing to provide continuity of care; and failing to train staff to provide sufficient mental health care and to appropriately authorize transport.  The court agrees that Yeo's allegations challenge the policies and practices of PHS, rather than asserting a cause of action based on a respondeat superior theory.  Accordingly, the court analyzes Yeo's section 1983 claim as asserted directly against PHS.

      B.    *Section 1983 Claim Against PHS*

According to PHS, the policies alleged by Yeo are not actionable under section 1983 on three grounds:  there is no section 1983 liability for failure to enact a policy; Yeo has failed to allege an underlying constitutional violation; and Yeo has failed to allege a specific policy in violation of section 1983.  Yeo bases his section 1983 claim on an allegation of inadequate medical care.

"An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met."  *Estelle v. Gamble*, 429 U.S. 97, 103 (1976).  Therefore, the government has an obligation to provide medical care for those it incarcerates.  Where the inmate has not yet been convicted and is, therefore, a pretrial detainee, "his rights derive from the due process clause rather than the Eighth Amendment's protection against cruel and unusual punishment."  *Gibson v. County of Washoe, Nevada*, 290 F.3d 1175, 1187 (9th Cir. 2002) (citations omitted).  That said, these due process violations are analyzed under the same standard as claims

arising under the Eighth Amendment. *See Banks v. Deschutes County*, No. 09-35787, 2011 U.S. App. LEXIS 656, at *2 (9th Cir. Jan. 11, 2011) ("We analyze pretrial detainees' due process claims under the same standard that we apply to Eighth Amendment claims of convicted prisoners."). The standard for finding that medical care is insufficient and, thus, violates the Eighth Amendment, and by extension the due process clause, is "deliberate indifference." *Id*. at 104-105.

The deliberate indifference of a prison official that a plaintiff must demonstrate to be in violation of the Eighth Amendment is greater than the standard for ordinary medical negligence. *See Estelle*, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). The plaintiff must also show something more than a mere difference of medical opinion. "To prevail under these principles, [the plaintiff] must show that the course of treatment the doctors chose was medically unacceptable under the circumstances," and that this course was pursued "in conscious disregard of an excessive risk to plaintiff's health." *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (internal citations omitted). Furthermore, the deliberately indifferent prison official must commit a purposeful and affirmative act. *See King v. Atiyeh*, 814 F.2d 565, 568 (9th Cir. 1978) ("State officials are not subject to suit under *section 1983* unless they play an affirmative part in the alleged deprivation of constitutional rights."). The prison official's conduct must also give rise to harm, although the harm need not be substantial. *McGuckin v. Smith*, 974 F.2d 1050, 1060 (9th Cir. 1992), *overruled on other grounds, WMX Technologies, Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc).

The court should consider both the seriousness of the prisoner's medical need and the nature of the defendant's response to that need. It is a subjective standard that "focuses only on what a defendant's mental attitude actually was." *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004)

(internal citations and quotation marks omitted).  "If a prison official should have been aware of the risk, but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk."  *Id.*

1.    Failure to Enact a Policy

PHS asserts that a failure to enact a policy is not a basis for section 1983 liability.  According to PHS, Yeo merely alleged that PHS failed to develop a system to verify medications where the verifying source is temporarily unavailable, i.e., on weekends or holidays; failed to develop policies to deal with foreseeable mental decompensation of inmates; and failed to develop a policy to evaluate whether an inmate could be safely transported to another facility. In support of this proposition, it cites *Wanger v. Bonner*, 621 F.2d 675 (5th Cir. 1980), a Fifth Circuit Court of Appeals case.  In *Wanger*, the court distinguished between affirmative policies that "precipitated the alleged unconstitutional actions" and "a failure to adopt policies to prevent constitutional violations[,]" noting that the failure to adopt policies "would not be an adequate basis for liability under [section] 1983." *Id*. at 680.  The *Wanger* court relied on the Supreme Court decision in *Rizzo v. Goode*, 423 U.S. 362, 375-76 (1976).

In *Rizzo*, the district court attempted to address "an assertedly pervasive pattern of illegal and unconstitutional mistreatment by police officers" of the minority citizens of the City of Philadelphia. 423 U.S. at 366.  After an extensive evidentiary hearing, the district court ordered "petitioners to draft, for the court's approval, 'a comprehensive program for dealing adequately with civilian complaints,'" based on guidelines provided by the district court. *Id*. at 369.  The Supreme Court characterized this approach as "an attempt by the federal judiciary to resolve a 'controversy' between the entire citizenry of Philadelphia and the petitioning elected and appointed officials over what steps

might, in the Court of Appeals' words, '(appear) to have the potential for prevention of future police misconduct.'" *Id.* at 371 (quoting *Goode v. Rizzo*, 506 F.2d 542 (3d Cir. 1974)). The Court rejected the district court's efforts and, in doing so, stated that "petitioners' failure to act in the face of a statistical pattern" of police abuses was not actionable under section 1983. *Id.* at 376. *Rizzo* did not generally hold that any failure to establish a policy where such failure may foreseeably result in constitutional violations was not actionable under section 1983.

Thus, PHS has failed to support its contention that failing to enact a policy cannot provide a basis for a section 1983 claim. In fact, the Ninth Circuit has at least impliedly recognized that a failure to enact a policy may give rise to a violation of constitutional rights. *See Erdman v. Cochise County, Ariz.*, 926 F.2d 877, 881 ("In this case, no policy or custom, (or even the absence of a policy or custom), of Cochise County or the City of Douglas deprived plaintiff of his constitutional rights."). The court is not persuaded that a public entity could avoid liability for constitutional violations simply by failing to enact policies to protect inmates from harm. Without further support from PHS, the court declines to grant summary judgment against these claims on this basis.

### 2.    Underlying Constitutional Violation

PHS argues that Yeo has failed to allege an underlying constitutional violation and failed to show that PHS was deliberately indifferent to Yeo's medical needs. PHS cites *City of Canton v. Harris*, 489 U.S. 378 (1989): "'Municipal liability under [section] 1983 attaches where – and only where – a deliberate choice to follow a course of action is made from among various alternatives' by city policymakers." (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 483-84 (1981)). PHS also argues that Yeo has failed to establish, by way of previous incidents, that it was aware of the risk of constitutional injury. Yeo responds that he has alleged specific policies and instances in which PHS

demonstrated deliberate indifference to his serious medical needs, both in delaying his access to a psychiatric evaluation and failing to provide continuity of care.

### a.    *Delay of Psychiatric Evaluation*

Yeo first argues that PHS was on notice of Yeo's mental health issues but failed to provide him with needed medication. Yeo was screened upon intake and reported to the screener that he was on medication, but had not taken it for two days, and signed a release to allow medication verification. Documentation of Yeo's 2007 stay in Washington County shows that prison officials were aware of his 2005 stay, yet they took no steps to review readily available information or retrieve other information. Further, information on the inmate transport form demonstrates that prison officials had knowledge that Yeo was mentally ill. The form bears the designation "12-34" which refers to inmates with mental illness. Despite this notice, PHS still failed to provide Yeo with the necessary medications while he was in its care.

Yeo next argues that PHS's policy of postponing psychiatric evaluation until the medication verification is complete prevented him from an earlier diagnosis of his compromised mental state. Yeo cites *Gibson* wherein the court ruled that an affirmative policy delaying medical screenings for uncooperative inmates created a substantial risk of harm to those with specific mental illnesses. *Gibson,* 290 F.3d 1175. The court noted that existence of the requisite awareness of the risk could be established via circumstantial evidence. Here, Yeo argues that delaying his psychiatric evaluation pending receipt of the medication verification prevented Yeo from receiving the medical care that he needed and ultimately led to Yeo being restrained. Yeo's expert witness, Dr. Curry, concluded that the policy of substituting medication verification for timely care was so obviously inadequate that it must have been deliberately ignored.

The court agrees with PHS that Yeo has failed to produce evidence of a policy wherein PHS delays psychiatric evaluations until medications are confirmed. The record evidence indicates that, when an inmate arrives at the Washington County Jail and informs staff that he or she is on medication, the protocol is to ask the inmate where they got the medications, fill out a Release of Information form, and fax it to the inmate's medication provider. If the initial request is unsuccessful, it is standard practice to attempt a second contact within a day or two. (Herzog Depo. 93:4-25.) However, if the provider is unavailable and the inmate needs immediate attention, PHS will contacted a physician on call to immediately address the inmate's medical condition. (Herzog Depo. 95:1-25.) Yeo has provided no contrary evidence showing that it was the established practice to strictly delay a psychiatric evaluation pending receipt of medication confirmation.

        *b.*      *Lack of Continuity of Care*

Yeo also argues that PHS was deliberately indifferent to his serious medical needs in failing to adequately communicate his medical information to Multnomah County and, thus, disrupting the continuity of care between facilities. Dr. Curry testified to the critical importance of continuity of care and that, although PHS had a policy to ensure continuity, its actual practice was inconsistent with this policy.

Yeo has presented some evidence that, in actual practice, continuity of care is not consistently maintained. In his case, Yeo has shown that the inmate transfer form was not used in a manner consistent with the goal of providing continuous care. However, Yeo is unable to establish that this is the result of practices so widespread so as to amount to an unofficial policy. Because Yeo has failed to identify a specific policy, whether official or unofficial, giving rise to a constitutional violation, Yeo has no ground upon which to base his section 1983 claim and PHS's motion for

summary judgment on this claim is granted.

    *C.*    *Punitive Damages*

Yeo seeks punitive damages against PHS for an allegedly deliberate and reckless disregard for Yeo's obvious and serious medical need.  Such damages are available for violations of section 1983 where the requisite mental state is present.  "A jury may award punitive damages under section 1983 either when a defendant's conduct was driven by evil motive or intent, or when it involved a reckless or callous indifference to the constitutional rights of others."  *Davis v. Mason County*, 928 F.2d 1473, 1485 (9th Cir. 1991) (citing *Smith v. Wade*, 461 U.S. 30, 56 (1983)).  However, because Yeo's section 1983 claims against PHS do not survive summary judgment, the court need not rule on this issue.

    *D.*    *Negligence – Washington County*

Yeo alleges a claim of negligence against Washington County under the Oregon Tort Claims Act ("the OTCA").  The OTCA provides that "every public body is subject to action or suit for its torts and those of its officers, employees and agents acting with in the scope of their employment or duties, whether arising out of a governmental or proprietary function . . . ."  OR. REV. STAT. 30.265(1) (2009). Washington County argues that Yeo's claim fails because damages for mental distress are not available where there is no physical impact.  Yeo argues that he qualifies for the exception to the physical impact rule as set forth in *Curtis v. MRI Imaging Services II*, 327 Or. 9, 956 P.2d 960 (1998).

In *Curtis*, the plaintiff argued that medical professionals have a heightened duty to guard against subjecting patients to medical risks, including those of a psychological nature.  The trial court rejected this argument, but the Oregon Court of Appeals reversed, concluding that

> although evidence of an accompanying physical injury generally is required, negligent infliction of emotional distress is actionable without physical injury, if the negligent conduct infringed on some "legally protected interest" apart from causing the claimed emotional distress. . . . [T]he phrase, "legally protected interest," refers to a duty that goes beyond or is distinct from the general duty . . . to avoid foreseeable injuries.

*Id.* at 12-13 (internal citations omitted). The Oregon Supreme Court agreed: "We are persuaded that, when the claim is that a medical practitioner breached a professional duty to guard against a specified medical harm, the fact that that harm is psychological rather than physical is not a bar to liability." *Id.* at 15. The court explained that, while a medical professional is not liable for any psychological harm that is reasonably foreseeable, "where the standard of care in a particular medical profession recognizes the possibility of adverse psychological reactions or consequences as a medical concern and dictates that certain precautions be taken to avoid or minimize it," such a duty arises and may be legally actionable. *Id*. at 15-16.

Yeo argues that he may state a claim for negligence because "[i]t [was] clearly foreseeable that the failure to provide a mentally ill person with proper treatment will cause psychological injuries in many cases." (Plaintiff's Response Brief 11.) However, in so arguing, Yeo ignores the threshold requirement of *Curtis*, that a "legally protected interest" is created by a heightened duty that goes above and beyond the general duty to avoid foreseeable injuries. Although Yeo's claim does involve medical care, it is distinct from the type of claim addressed by *Curtis.* Yeo's claim is not against a medical professional who failed to guard against foreseeable psychological harm, but rather a claim against a public entity whose duty to provide medical care is defined in the context of a section 1983 claim and is, explicitly, a lesser duty than the standard of care in a medical negligence action. *Estelle*, 429 U.S. at 106. Yeo's remaining argument, that the injury was

foreseeable, does not trigger the exception articulated in *Curtis*.  Thus, to the extent that Yeo did not suffer a physical injury, he cannot state a claim for negligence.

Yeo argues that, even if the court declines to recognize his claim for psychological injury, he suffered foreseeable physical injuries and any remaining questions are factual ones for the jury. Washington County responds that Yeo suffered no physical injury while in its custody and cannot establish that its conduct caused a reasonably foreseeable harm.  In order to establish causation, a plaintiff must demonstrate a reasonable probability that the alleged conduct caused the alleged harm. *See Joshi v. Providence Health System of Oregon Corp.*, 198 Or. App. 535, 545, 108 P.3d 1195 (Or. App. 2005) ("Proof of cause-in-fact 'must have the quality of reasonable probability, and a mere possibility that the alleged negligence of the defendant was the . . . cause of plaintiff's injuries is not sufficient.'" (quoting *Cleland v. Wilcox*, 273 Or. 883, 887, 543 P.2d 1032 (1975))).  Yeo has failed to do so.  The evidentiary record at summary judgment reveals that Yeo was medically screened upon intake at Washington County, at which time he reported being on several medications.  This information was communicated on his transport form, which form also stated that he suffered from schizophrenic tendencies and bipolar disorder.  At the time he was placed in the custody of Multnomah County, Yeo was distressed, but there is no evidence that the treatment he experienced at MCDC was foreseeable at the time of the transfer.  To the extent Washington County provided the necessary information to Multnomah County and left Yeo in Multnomah County's care, which it did, the subsequent events were not reasonably foreseeable and the causal chain was broken upon the change in custody.  Washington County is entitled to summary judgment on this claim.

Finally, Washington County argues that, even if Yeo is allowed to proceed on his negligence claim, Washington County is barred from liability by discretionary immunity.  The court has granted

summary judgment against Yeo's negligence claim and, thus, need not address the discretionary immunity issue.

II.    Multnomah County's Motion for Summary Judgment

    A.    *Evidentiary Objections*

Multnomah County asserts two evidentiary objections against Yeo's evidentiary submissions. First, Multnomah County argues that three of Dr. Curry's assertions lack an evidentiary basis and should be stricken. Specifically, Dr. Curry asserts that, had Yeo presented to a hospital in the condition he was in upon arrival at MCDC, he would have been admitted to the hospital; that Multnomah County exempts inmates from screening at intake if they are uncooperative, intoxicated, or mentally ill; and that corrections officers at MCDC had knowledge of Yeo's condition.

The court agrees that these statements are not supported by the evidentiary record. First, Dr. Curry, having not been present when Yeo arrived at MCDC, lacks personal knowledge of Yeo's condition and, also, cannot speak to the intake decision a hospital would make. Dr. Curry may state his opinion on this point but his conclusory assertion that Yeo would have been admitted is stricken. Second, the record does not support Dr. Curry's assertion that uncooperative inmates are never screened in the normal course. Dr. Curry lacks personal knowledge to state this as fact, and this assertion is stricken. Third, Dr. Curry lacks personal knowledge to assert as fact what MCDC staff knew and when they knew it. Thus, this statement is stricken as well.

Second, Multnomah County moves to strike statements about the content of telephone calls made to MCDC by Yeo's family members to MCDC because the recipients of the phone calls have not been identified and, thus, they cannot be identified as agents of Multnomah County acting within the scope of their agency. Thus, Multnomah County argues, the calls may not be admitted as

admissions by party opponents and are inadmissible hearsay.

The court is not persuaded that statements about these phone calls should be stricken on this basis. It is a reasonable presumption that, when placing a telephone call to the phone number listed for MCDC, the call will be answered by MCDC staff. Furthermore, record evidence reveals that Yeo's family members did in fact call MCDC and speak with MCDC staff. On at least three occasions, progress notes indicate that both Yeo's mother and sister placed phone calls to MCDC and spoke with MCDC staff. (Greenberg Decl., Ex. 2 at 13; Henry Decl., Ex. 1 at 10-11.) For these reasons, the court declines to strike these statements.

 B. *Section 1983 and Inadequate Medical Care*

Yeo alleges that Multnomah County was deliberately indifferent to his serious medical needs when it unreasonably delayed his medical care.

 1. <u>Delay in Treatment</u>

Multnomah County argues that Yeo has failed to establish that the delay in treatment was the cause of his injuries. Multnomah County maintains that its "wait and see" approach was medically sound because, upon arrival Yeo still had street drugs in his system and, until June 1, 2007, Yeo did not appear to need medical care. Multnomah County also cited the risk of prematurely initiating care. Finally, Multnomah County argues that a timely initial screening would not have altered the outcome because Yeo did not meet commitment criteria and may not have complied with proffered medical treatment.

Yeo responds that Multnomah County knew or should have known that Yeo required psychological care, even if he himself could not adequately communicate his need at the time. In fact, Multnomah County's failure did cause him an unnecessarily severe and prolonged period of

decompensation, exposed him to unsafe and injurious conditions, and resulted in repeated tasering and physical injuries. The record demonstrates that, after being denied care for two days, Yeo acutely decompensated, and, after being seen by a psychiatric nurse, was taken to the hospital. Thus, Yeo argues, Multnomah County's characterization of the success of its "wait and see" approach is misleading.

Yeo cites *Gibson v. County of Washoe, Nevada*, 290 F.3d 1175 (9th Cir. 2002), where the plaintiff alleged a failure to provide a timely medical screening. In that case, the county had an explicit policy that called for an initial screening upon the inmate's arrival, but the screening was to be delayed where the inmate "'[was] combative, uncooperative or unable to effectively answer questions due to intoxication.'" *Id.* at 1183 (quoting the county policy). The court held that "[t]his mandatory exception to the County's normal medical screening procedures pose[d] a substantial risk of serious harm to those with certain mental illnesses." *Id.* at 1189. Where, for example, an inmate exhibited manic symptoms, the very behavior that made the inmate uncooperative and combative was evidence of the urgent medical need. The court concluded that the policy precluded assessment of inmates in that condition and, thus, categorically denied treatment to those with a serious medical need.

When Yeo arrived at MCDC, he was extremely noncompliant such that he was fully restrained, wearing a spit sock, and was accompanied by severe warnings about his condition. Per their practice, MCDC staff bypassed standard booking procedures and removed Yeo to a separate cell, where he would not otherwise disrupt the booking process. Shortly thereafter, Yeo removed his clothing and engaged in a series of strange physical movements while standing on the toilet. One of the deputies who had observed him at booking filled out a request for a psychiatric evaluation of

Yeo.

Later that evening, Yeo was observed flooding his cell with water and toilet paper. Yeo initially resisted being moved to a different cell, but after being threatened with a taser, agreed to be moved without further incident. The next night, another staff member found that Yeo had smeared his cell with urine and feces. Yeo was not responsive and stared at the ceiling and mumbled. Later that evening, officers had to forcibly remove a non-compliant Yeo from the unsanitary conditions in his cell. Although he was threatened with a taser, he remained non-compliant until after three separate rounds of tasering, the result of which was that he fell to the ground and injured his head. Yeo was evaluated by a psychiatric nurse the following day who, within minutes, obtained medication for Yeo which he voluntarily ingested. He was given a suicide watch smock and medical staff attempted to clean the dried blood from his face, presumably from the wound he had sustained the night before. Later, it was determined that Yeo's wound required sutures. Thus, not only is there evidence that timely screening of Yeo may have yielded a different result, the evidence is clear that, upon being medically screened, Yeo received immediate treatment. As such, there is a reasonable basis to conclude that a timely screening of Yeo would have resulted his timely receipt of treatment. Furthermore, there is at least a genuine issue of material fact as to whether Yeo would have met commitment criteria and would have complied with medical treatment.

In sum, there is at least a genuine issue of material fact as to whether Multnomah County's delay in treating Yeo created a substantial risk of serious harm.

## 2.    Awareness of Risk

Multnomah County argues that it was not aware of any risk posed by its policies and so cannot be held liable under section 1983. In order to meet the standard for deliberate indifference

to a serious medical threat, the official actor must both be aware of the facts from which the inference of serious risk can be drawn and must also actually draw the inference. Such awareness is recognized in three scenarios. "First, a local government may be held liable 'when implementation of its official policies or established customs inflicts the constitutional injury.'" *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1249 (9th Cir. 2010) (quoting *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 708 (1978). "Second, under certain circumstances, a local government may be held liable under § 1983 for acts of 'omission' when such omissions amount to the local government's own official policy." *Clouthier*, at 1249 (citing *Cabrales v. County of Los Angeles*, 864 F.2d 1454, 1461 (9th Cir. 1988)). Again, this omission must meet the standard for deliberate indifference. *Id.* "Third, a local government may be held liable under § 1983 when 'the individual who committed the constitutional tort was an official with final policy-making authority' or such an official 'ratified a subordinate's unconstitutional decision or action and the basis for it.'" *Clouthier,* at 1250 (quoting *Gillette v. Delmore*, 979 F.2d 1342, 1346-47 (9th Cir. 1992)). "After proving that one of the three circumstances exist[s], a plaintiff must also show that the circumstance was (1) the cause in fact and (2) the proximate cause of the constitutional deprivation." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (citing *Arnold v. International Business Machines Corp.*, 637 F.2d 1350, 1355 (9th Cir. 1981)).

Multnomah County argues that Yeo has failed to establish that it had the requisite awareness of risk. It cites *Clouthier*, a Ninth Circuit decision wherein the plaintiffs, whose son had committed suicide while in custody, alleged that the "[c]ounty's procedures for dealing with mentally ill detainees were deficient, that the [c]ounty knew of these deficiencies, and that the [c]ounty's deliberate indifference resulted in their son's death." *Id.* at 1249. The court concluded that the

county was entitled to summary judgment because plaintiffs had failed to establish that the deficiencies in the County's actions with respect to plaintiffs' son were the result longstanding customs or practices. Furthermore, there was "no evidence that the County was on actual or constructive notice that deficiencies in the implementation of its policy would likely result in a constitutional violation." *Id.* at 1251.

According to Multnomah County, Yeo's allegation that he was not properly screened prior to being housed at MCDC, a practice that was widely tolerated despite being contrary to county policy, is not supported by evidence. Rather, it was Multnomah County's policy to screen every arrestee upon arrival at MCDC and prior to being admitted and housed. However, in the interest of overall safety, where an arrestee is dangerous or disruptive, he or she may be moved from the reception area to a separate cell prior to a formal screening. Typically, when this occurs, a notation is made on a master task list for the nurses indicating that the particular inmate still requires a formal screening. Here, Multnomah County maintains that Yeo was screened in a timely fashion. However, to the extent that the screening is considered untimely, its untimeliness was an anomalous error and was not a result of an established MCDC policy.

Finally, Multnomah County argues that Yeo has presented no evidence of repeated instances of deliberate indifference of such frequency that Multnomah County should have known that action was necessary, i.e., such action was plainly obvious. Again, Multnomah County relies on *Clouthier* for the proposition that it is insufficient to show that "'an incident or accident could have been avoided' if mental health staffers" had taken different steps. *Id.* at 1253 (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)). In *Canton*, the Supreme Court stated: "[i]n virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983

plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate

incident.'"  489 U.S. at 392.  However, imposing "'de facto respondeat superior liability'" on

municipal employers is an approach that has been rejected by the Supreme Court.  *Clouthier* at 1254

(quoting *Canton*, 489 U.S. at 392 (emphasis omitted)).

Yeo responds that, although Multnomah County's policy regarding intake screening is

facially sound, the practice of delaying the screening of difficult or uncooperative inmates is well

known and tolerated.  Yeo cited several instances in the evidentiary record where prison officials

admitted that the failure to complete medical screenings was a regular occurrence and was tolerated.

Burrow testified that corrections officials make the decision to house an inmate prior to screening

and that it happens with some frequency, though she could not say how frequently it occurred.

(Greenberg Decl., Ex. 3 at 71.)  Bane testified that delays in an initial screening "[do not] happen

very often." (Greenberg Decl., Ex. 3 at 29.)  Topor testified that housing an inmate without an initial

screening was "certainly a weekly occurrence." (Greenberg Decl., Ex. 3 at 16.)  Kitzing testified that

an initial screening was delayed at least once week.  (Greenberg Decl., Ex. 3 at 53.)  Multnomah

County admits that it delays the screening of problem inmates in the interest of safety, and to ensure

smooth operation of its booking procedures.  Yeo argues that, although these are legitimate concerns,

they do not relieve Multnomah County of its duty to provide adequate medical care, which includes

a timely initial screening.  Furthermore, even if Yeo's removal to the separation cell was necessary,

it is not clear why he was not screened after being placed there.

Yeo likens these facts to those in *Gibson* and argues that the purpose of an intake screening

is to identify those in need of medical attention and Multnomah County's official intake screening

policy demonstrates an awareness that some inmates do require immediate medical attention.

Although, unlike *Gibson*, the "wait and see" policy was unofficial, it was a well-known and accepted practice that occurred on at least a weekly basis at MCDC. As Yeo puts it, this policy actually increased the likelihood that an inmate who required mental health support would not be screened at intake and led to a foreseeable and repeated failure to adequately treat inmates with mental health issues.

Finally, Yeo distinguishes *Clouthier* from the present case. Specifically, Yeo argues, the failure of care was qualitatively different from the failure here. In *Clouthier*, the inmate was screened at intake and received immediate medical care. The failure occurred when medical and corrections officials failed to adequately communicate about the severity of the inmate's condition and the fact that he was a suicide risk. This resulted in the inmate's release into the general population and his subsequent suicide. Here, Yeo was not medically screened until after he was tasered and injured, nor was he prescribed medications that would have controlled his acute symptoms of decompensation. In *Clouthier*, summary judgment was granted because the relevant entity did not have actual or constructive notice of the communication deficiencies. Here, Yeo contends, Multnomah County had notice of the repeated failures to screen, although they were not documented.

The court agrees that Multnomah County's screening practice could reasonably be characterized as an unofficial policy capable of inflicting a constitutional injury. There is ample evidence that the booking process is postponed for problem inmates, on an at least weekly basis. Further, the practice by its very nature has a tendency to isolate inmates in need of more prompt medical attention. Thus, a reasonable finder of fact could conclude that Multnomah County was aware that its unofficial policy or custom was deliberately indifferent to serious medical needs.

### 3.    Moving Force

"In order to be a 'moving force' behind [a plaintiff's] injury, [the court] must find that the 'identified deficiency' in the County's policies is 'closely related to the ultimate injury.'" *Gibson*, 290 F.3d at 1196 (quoting *Canton*, 489 U.S. at 391).   That is, had the policy or practice been different, the injury "would have been avoided[.]"   *Id*. at 1196 (quoting *Oviatt v. Pearce*, 954 F.2d 1470, 1478 (9th Cir. 1992)).

Multnomah County argues that Yeo has failed to establish a close relationship between the identified deficiency and the injury sustained.  Here, despite Yeo's claims that Multnomah County's actions caused his decompensation, he also testified that he had already decompensated prior to arriving at MCDC and, further, that it can take months for him to recover from an episode of decompensation.  Thus, Multnomah County maintains, it is not reasonable to conclude that Yeo's episode of decompensation and the resulting severity of his injuries were caused by Multnomah County's inaction and, thus, Multnomah County cannot be held liable on this claim.  Yeo responds that, although he may have been in a state of decompensation prior to his arrival at MCDC, the relevant question is whether treatment in a timely manner would have mitigated the suffering and injuries that he subsequently sustained.

The court agrees with Yeo that a reasonable fact-finder could conclude that Multnomah County's inaction may have exacerbated his decompensated state and caused some or all of the harm suffered by Yeo.  The likelihood that Multnomah County was the moving force behind Yeo's injuries increased as the length of his incarceration, without treatment, grew longer.  The escalation of Yeo's symptoms and behaviors as well as the increasing severity of the control measures used against him also speak to the probability that Multnomah County's action or inaction was the moving

force behind Yeo's injuries.

Based on the evidentiary record before it, the court concludes that there are genuine issues of material fact as to whether the delay in treatment Yeo experienced at MCDC was the result of deliberate indifference to his serious medical needs, whether it was the result of an unofficial policy of Multnomah County, and whether this delay was a moving force in the injuries Yeo ultimately suffered.  Therefore, summary judgment is denied on this claim.

B.    *Negligence*

Yeo also alleges a negligence claim against Multnomah County for failure to assess and treat his mental illness under the Oregon Tort Claims Act ("OTCA"), arising from its initial failure to conduct a timely screening.  The OTCA provides that "every public body is subject to action or suit for its torts and those of its officers, employees and agents acting within the scope of their employment or duties, whether arising out of a governmental or proprietary function . . . ." OR. REV. STAT. 30.265(1) (2009).  Yeo's claim is based on Multnomah County's alleged failures to hospitalize and medicate him in a timely fashion.

For claims of negligence, unless the parties have a relationship giving rise to a heightened duty of care, "the issue of liability for harm actually resulting from defendant's conduct properly depends on whether that conduct unreasonably created a foreseeable risk to a protected interest of the kind of harm that befell the plaintiff." *Fazzolari v. Portland School District No. 1J*, 303 Or. 1, 17, 734 P.2d 1326 (1987).  The court's role in this determination is limited in that "[t]he jury is given a wide leeway in deciding whether the conduct in question falls above or below the standard of reasonable conduct deemed to have been set by the community.  The court intervenes only when it can say that the actor's conduct clearly meets the standard or clearly falls below it."  *Id*. at 17-18.

With respect to what is or is not foreseeable, "the concept of foreseeability refers to generalized risks of the type of incidents and injuries that occurred rather than predictability of the actual sequence of events." *Id.* at 21.

The plaintiff must also establish a sufficient causal relationship between defendant's conduct and the resulting harm to plaintiff. In evaluating whether the defendant's conduct was the cause-in-fact of the plaintiff's harm, Oregon courts have applied the "substantial factor" test. In *Joshi v. Providence Health System of Oregon Corp.*, 198 Or. App. 535, 539, 108 P.3d 1195 (Or. App. 2005), the Oregon Court of Appeals explained that "[w]hen employed as a standard for determining cause-in-fact, the phrase 'substantial factor' generally does not eliminate the concept of 'but-for' causation. Rather, the substantial factor standard is an alternate description of the cause-in-fact test and requires a showing of 'but-for' causation in all but a few cases." In order to establish cause-in-fact, a plaintiff must demonstrate a reasonable probability that the alleged conduct caused the alleged harm. *See id.* at 545 ("Proof of cause-in-fact 'must have the quality of reasonable probability, and a mere possibility that the alleged negligence of the defendant was the . . . cause of plaintiff's injuries is not sufficient." (quoting *Cleland v. Wilcox*, 273 Or. 883, 887, 543 P.2d 1032 (1975))). In certain cases, expert testimony is required to establish a reasonable medical probability: "When the element of causation involves a complex medical question, as a matter of law, no rational juror can find that a plaintiff has established causation unless the plaintiff has presented expert testimony that there is a reasonable medical probability that the alleged negligence cause the plaintiff's injuries." *Baughman v. Pina*, 200 Or. App. 15, 18, 113 P.3d 459 (Or. App. 2005).

Multnomah County argues that Yeo cannot establish that (1) its conduct was unreasonable; (2) the risk of harm was foreseeable; and (3) its conduct was the cause-in-fact of the harms Yeo

suffered.

### 1.    Reasonableness

Multnomah County argues that its conduct was reasonable in light of the standard of care for inmates and the constraints of providing medical care in the jail setting, for several reasons.  First, an inmate is not moved to a hospital unless the inmate cannot be adequately cared for in the jail setting.  Second, Yeo's condition was not unlike that of many prisoners who present at MCDC. Third, the possibility that an inmate's condition will worsen is insufficient to justify hospitalization. Fourth, Yeo was sufficiently stable on arrival to justify taking a "wait and see" approach.  Yeo argues that Multnomah County's conduct was unreasonable in light of his condition upon arrival and the unreasonable amount of time that passed before Yeo received an initial screening.

The court agrees that there is a genuine issue of material fact as to whether Multnomah County's conduct was reasonable.  First, by the time Yeo arrived at Multnomah County he was in serious distress such that he was restrained and wearing a spit sock.  Upon arrival, Yeo engaged in bizarre and unpleasant behaviors, including stripping naked and "dancing" on the toilet, as well as flooding his cell and soiling it with food and human waste.  Second, Yeo's condition was not meaningfully addressed for approximately two days, despite the seriousness of his condition.  A reasonable fact finder could conclude that Multnomah County's conduct was unreasonable.

### 2.    Foreseeability

Multnomah County contends that it did not know or have reason to know that Yeo required medication and, thus, Yeo's injuries were not foreseeable.  Furthermore, Yeo's admission that he was on drugs upon his arrival at MCDC underscores the difficulty of determining when an inmate needs medical attention and when they merely need time for the drug's effects to wear off.  Yeo

argues that his injuries were foreseeable.

The court agrees that there is a genuine issue of material fact as to whether Yeo's injuries were foreseeable. Yeo presented to MCDC in acute distress and his condition only worsened over time; at some point, it was unreasonable to further delay providing treatment to Yeo and subsequent injuries were foreseeable. There is evidence in the record which suggests that Multnomah County had actual notice that Yeo was on medication and that his behaviors were the result of a psychological decompensation, rather than the effects of coming down off of illegal drugs. Because Multnomah County could reasonably have foreseen injury to Yeo, there is a genuine issue of material fact as to foreseeability.

> 3.    *Causation*

Multnomah County argues that Yeo cannot establish that its conduct was the cause-in-fact of the injuries he suffered because his decompensation had already commenced upon his arrival at MCDC and there is no evidence that earlier intervention would have prevented the ultimate injuries. Further, Multnomah County maintains, there is no evidence that Yeo would have complied with medical care offered him or that he could have been forced to comply with such care. Yeo argues that there is at least a question of fact as to whether Multnomah County's conduct was the cause-in-fact of his injuries. He states that, although he began to decompensate prior to his arrival at MCDC, Multnomah County's initial and ongoing failure to provide needed medical care was the proximate cause of his injuries.

The court agrees that there is a genuine issue of material fact as to whether Multnomah County was the cause-in-fact of Yeo's injuries. Where the provision of medical care is at issue, the court must consider whether there was a reasonable medical probability that the defendant's conduct

caused the plaintiff's injury. Multnomah County's expert witness, Dr. Bloom, concluded that "it is not possible to determine within a reasonable degree of psychiatric probability that what transpired in the Multnomah county and Washington County jails in 2007 was a substantial factor in causing any subsequent symptoms described by Mr. Yeo." (Bloom Decl.¶ 17.) Yeo has also presented expert testimony for the proposition that Multnomah County's conduct caused Yeo's injury. Dr. Curry, Yeo's expert, concluded that "a combination of county policy failures and inaction by Corrections health employees denied Mr. Yeo access to care by causing unreasonable delay in obtaining the assessment and treatment necessitated by his serious mental disorder." (Curry Decl. ¶ 42.) In addition, Yeo presents the testimony of Dr. J. Theresa Shelby, a psychiatrist who, upon review of the record in this case stated that it was a reasonable conclusion that the failure to medicate Yeo between May 27 and May 30, 2007, "combined with the stress of incarceration" caused Yeo's psychological condition to worsen. (Shelby Decl. ¶ 12.) As such, there is a factual issue that must be resolved as to causation.

In conclusion, there is a genuine issue of material fact as to whether Multnomah County was negligent is failing to address Yeo's medical needs while he was in its custody. Multnomah County's motion for summary judgment on this claim is denied.

C.    *Discretionary Immunity*

The scope of liability under the OTCA is limited, however, where the public official is acting in a discretionary capacity: "The OTCA . . . insulates public employees and public bodies from 'any claim based upon the performance of or the failure to exercise or perform a discretionary function or duty, whether or not the discretion is abused.'" *Thornton v. City of St. Helens*, 425 F.3d 1158, 1168 (9th Cir. 2005) (quoting *Tennyson v. Children's Servs. Div.*, 308 Or. 80, 775 P.2d 1365, 1370

(1989)).  The statute states:  "[e]very public body and its officers, employees and agents acting within the scope of their employment or duties . . . are immune from liability for:  . . . [a]ny claim based upon the performance of or the failure to exercise or perform a discretionary function or duty, whether or not the discretion is abused."  OR. REV. STAT. 30.265 (2009).  Thus, the relevant inquiry is whether the allegedly negligent activity was part of a discretionary function.

"Governmental defendants are protected from liability for decisions that require a policy judgment by a person or body with governmental discretion."  *Timberlake v. Washington County*, 228 Or. App. 607, 612-13, 209 P.3d 398 (Or. App. 2009) (citing *Little v. Wimmer*, 303 Or. 580, 588, 739 P.2d 564 (1987)).  In the context of governmental decisions about roads, the Oregon Supreme Court explained that making decisions is often distinct from making discretionary policy decisions:

> Like virtually every other activity, both planning and design, as well as maintenance of roads, frequently require the making of decisions which do not involve the making of public policy; for example, the decision whether to make a safety fence two feet rather than three feet high or the decision to first remove snow from Street A rather than from Street B.  These decisions involve the use of "discretion" in the sense that a choice must be made but they do not involve the use of "discretion" in the sense that policy decision is required.

*Stevenson v. Department of Transportation*, 290 Or. 3, 10-11, 619 P.2d 247 (1980).  Put another way, "the decision *whether* to protect the public by taking preventive measures, or by warning of a danger, if legally required, is not discretionary; however, the government's choice of *means* for fulfilling that requirement may be discretionary."  *Garrison v. Deschutes County*, 334 Or. 264, 274, 48 P.3d 807 (2002) (emphasis in original)).  And, although policy decisions are themselves immune, their implementation is not and liability may attach where policies are negligently implemented.  *Vokoun v. City of Lake Oswego*, 335 Or. 19, 33, 56 P.3d 396 (2002).

Notably, where a policy is developed as a result of budgetary constraints and the allocation

of resources, such resulting actions enjoy discretionary immunity. *See Timberlake*, 228 Or. App. at 614 (referring to another case where "the evidence showed that the failure of the city to inspect the sidewalk was a discretionary act, occasioned by its 'balancing of competing priorities' in the face of budgetary constraints." (quoting *Sager v. City of Portland*, 68 Or. App. 808, 684 P.2d 600, *rev. den.* 298 Or. 37, 688 P2d 845 (1984))).

In this case, the parties dispute whether the negligence claim implicates the judgment of policy makers. Multnomah County maintains that the alleged liability stems from the allocation of budgetary resources, which is a discretionary policy determination. Yeo argues that Multnomah County failed to identify the policy judgments giving rise to its negligent acts against Yeo and, thus, failed to meet its burden.

Here, Yeo's negligence claim is premised on conduct that is both discretionary and non-discretionary. To the extent that Yeo's claim is based on the conduct of MCDC employees during the period in which Yeo was detained, it is based on non-discretionary actions. Yeo alleges that MCDC staff acted negligently in responding to his medical and mental health needs and there is sufficient evidence in the record to create genuine issues of material fact to support such a claim. Accordingly, to that extent, Multnomah County's motion for summary judgment on the negligence claim is denied. However, to the extent that Yeo's claims depend on a failure of Multnomah County to allocate adequate resources to staffing or medical facilities at MCDC or adopt other specific policies, such claims are barred by Multnomah County's discretionary immunity.

### Conclusion

For the reasons stated, Washington County and PHS's motion for summary judgment (#64) is GRANTED. Multnomah County's motion for summary judgment (#68) is DENIED. Multnomah

County's evidentiary objections, asserted in its reply memorandum (#116) are GRANTED in part

and DENIED in part.

IT IS SO ORDERED.

DATED this 24th day of March, 2011.


_____/s/ John V. Acosta_____
JOHN V. ACOSTA
United States Magistrate Judge